# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 25-59C
(Filed: June 24, 2026)

|  |  |
|---|---|
| **IGNATIUS M. TEE, JR.**, | ) |
|  | ) |
| *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **UNITED STATES**, | ) |
|  | ) |
| *Defendant.* | ) |
|  | ) |

*Jason J. Greene* (argued), Military Justice Firm, PLLC, Seattle, WA, for plaintiff.

*Douglas G. Edelschick* (argued), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General; and *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Lt. Col. Suzanne M. Dempsey*, Office of the Judge Advocate General, U.S. Department of the Navy, Washington Navy Yard, DC, Of Counsel.

## OPINION AND ORDER

***BONILLA, Judge***.

United States Navy Petty Officer First Class (PO1/E-6) Ignatius M. Tee, Jr. was disenrolled from the Seaman to Admiral–21 (STA-21) program after successive Performance Review Boards (PRB) found he had engaged in inappropriate behavior toward fellow midshipmen. PO1 Tee filed this action challenging the procedures employed by the Navy in convening, adjudicating, and acting on the findings and recommendations of both PRBs. On November 10, 2025, the Court granted-in-part and denied-in-part the government's motion to dismiss. *Tee v. United States*, 179 Fed. Cl. 33 (2025). After PO1 Tee filed a third amended complaint asserting an

additional claim, the parties filed dispositive cross-motions.[1]  The Court heard oral argument on June 17, 2026.  For the reasons set forth below, PO1 Tee's dispositive motion is denied, and defendant's cross-motion for judgment on the administrative record is granted.

## BACKGROUND[2]

After the Court ruled on the government's motion to dismiss, PO1 Tee voluntarily dismissed Count X.[3]  Currently, only three of PO1 Tee's ten original claims, plus an additional claim asserted in his third amended complaint, remain: first, that the Navy violated NSTC M-1533.2E § 6-10 ¶ 6(a)(2) by failing to "[p]rovide [PO1 Tee] with . . . a complete copy of the preliminary inquiry" report before the second PRB (PRB-2)[4]; second, that the Navy violated PO1 Tee's rights under Article 31 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 831, by drawing an adverse inference from his refusal to answer questions during PRB-2; third, that the Navy improperly considered whether PO1 Tee should be medically disqualified from the STA-21 program without affording him an opportunity to respond; and fourth, that the Navy unlawfully considered extra-record evidence in deciding whether PO1 Tee should be disenrolled from the STA-21 program.

With the filing of the administrative record, additional material facts have come to light.  The administrative record includes an unredacted copy of the preliminary inquiry report that is the subject of PO1 Tee's first claim. *Compare* AR 491–510 (redacted report), *with* AR 273–92 (unredacted report).[5]  The version electronically delivered to PO1 Tee in advance of the PRB-2 proceeding—and,

---

[1] As is typical in military backpay cases, the parties initially filed cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).  As addressed *infra*, PO1 Tee subsequently sought to recast his filing as a motion for summary judgment under RCFC 56.

[2] The facts and procedural history of this matter are detailed in the Court's November 10, 2025 decision. *Tee*, 179 Fed. Cl. at 36–39.  To provide context for the analysis herein, the Court includes a recapitulation of the relevant background, additional information included in the administrative record, and a summary of proceedings post-dating the Court's prior opinion.

[3] As noted in the Court's November 10, 2025 opinion, Count X involved "tuition reimbursements requested prior to PO1 Tee's November 2024 disenrollment from the STA-21 program." *Tee*, 179 Fed. Cl. at 39.

[4] NSTC M-1533.2E is a citation to the April 28, 2023 version of the Naval Service Training Command Regulations for Officer Development Programs Manual (Naval Manual).  This version was updated to NSTC M-1533.2F on February 5, 2025. *See Regulations for Officer Development (ROD) Programs*, NAVAL SERV. TRAINING COMMAND (Feb. 5, 2025) (executive summary), *available at* https://perma.cc/2FMR-4WKH.  As the Court stated in its November 10, 2025 opinion, because the challenged actions took place before the February 2025 update, the April 2023 version of the Naval Manual governs this case. *Tee*, 179 Fed. Cl. at 37 n.3.

[5] "AR __" is a citation to a Bates-numbered page in the administrative record filed in this case.

2

thus, the version previously presented to the Court in connection with the government's motion to dismiss—redacted certain information, including the names of victims and witnesses as well as the names, signatures, and contact information of PO1 Tee's superior officers.[6, 7]    Relatedly, the administrative record contains contemporaneous communications showing that the Navy invited PO1 Tee "to review all unredacted documents in-person" as early as April 26, 2024—more than two weeks before the PRB-2 hearing took place.[8]  AR 539; *see* AR 558; AR 14.  The proposed in-person inspection of the unredacted report, however, would be under supervision, and PO1 Tee would be barred from taking written notes or otherwise capturing the information electronically.[9]   Rejecting what he and his counsel concluded were unacceptable restrictions, PO1 Tee declined the Navy's invitation.  Minutes before the PRB-2 hearing was about to commence, Navy officials produced an unredacted copy of the preliminary inquiry report to PO1 Tee and his counsel for use during the proceeding.[10]

Next, the administrative record includes what PO1 Tee labels two "extra-record missives" that the Professor of Naval Science (PNS)—the official charged with administering the PRB—delivered to the Naval Service Training Command Commander (CNSTC) during the command's review of PRB-2.  The first missive is the PNS Remarks section of PO1 Tee's Naval Reserve Officers' Training Corps (NROTC) Student Disenrollment Report, dated September 9, 2024.  The PNS's remarks summarized PRB-2, defended the procedures followed during PRB-2, and

---

[6] Comparing the reports, the Court noticed two additional redactions: the words "and her roommate" were redacted from a summary of a witness interview; and the words "[h]e added" were redacted from a summary of a different witness interview.  *Compare* AR 291–92, *with* AR 509–10.

[7] PO1 Tee's command redacted the names of twelve individuals who were contacted or interviewed by the Navy or otherwise gave statements.  PO1 Tee's command also redacted the names of some fourteen other individuals identified in the report.

[8] Although PRB-2 was originally scheduled for May 2, 2024, the Navy agreed to delay the hearing until mid-May 2024 at PO1 Tee's request in the same email in which they offered him the in-person review.

[9] The administrative record is unclear as to whether PO1 Tee's counsel would have been able to view the unredacted preliminary inquiry report.  *See* AR 539 ("*OC Tee* will be able to review all unredacted documents in-person and will need to schedule a time to do that . . . . *He* will not be able to have his phone or camera or note taking device (paper, pencil, pen, tablet, etc[.]) when reviewing the documents." (emphasis added)); ECF 54 at 39 (government noting that, if PO1 Tee had accepted the command's offer to review the unredacted report, "he could have consulted with counsel during breaks"); ECF 57 at 9 (plaintiff offering analogy wherein "the Defendant told the Court that it cannot give the Court an unredacted copy of the report, but the Court could send a law clerk to sit and read it").  During oral argument, the parties noted that when PO1 Tee's command invited him to review the unredacted report in person, there was no discussion regarding whether PO1 Tee's counsel could accompany him.  As a practical matter, PO1 Tee's counsel would have had to travel over 1,500 miles to participate in the in-person review.

[10] During oral argument, PO1 Tee's counsel represented that he returned the unredacted report to the Navy when the hearing concluded.

recommended certain follow-on actions.  This information was not included in the version of the disenrollment form that PO1 Tee signed on August 9, 2024.[11]

The second missive is the PNS Summary Letter dated July 29, 2024, addressed to the Director of NROTC Operations.  The letter contains a brief overview of the investigation into PO1 Tee's conduct and a two-page statement culminating in the conclusion that PO1 Tee "is detrimental to the good order and discipline of [his] unit." AR 52.  It also addresses PO1 Tee's allegations that the NROTC command improperly influenced one of the recorder's witnesses:

> [T]he issues raised by [PO1] Tee's lawyer surrounding [a witness] must be addressed. . . . Comments by [PO1] Tee's lawyer about her "change in tune" are surely a result of her being corrected for actions unrelated to [PO1] Tee and not a result of the command coaching or influencing her statements.

AR 52.  PO1 Tee maintains, and the government does not dispute, that he was never given an opportunity to respond to this document.  According to PO1 Tee's Disenrollment Checklist, the NROTC Disenrollment Report requires the student's signature, whereas the PNS Summary Letter does not.[12]

The administrative record further contextualizes the medical evaluations PO1 Tee underwent following the first PRB (PRB-1).  After PO1 Tee presented concerns that he might harm himself, he was taken to a military mental health facility for evaluation and treatment.  Three months later, in February 2024, PO1 Tee

---

[11] In his motion for judgment on the administrative record, PO1 Tee calls attention to the August 9, 2024 version of the disenrollment report at AR 1040.  *See* ECF 51-1 at 24–25 ("[T]he two missives from the PNS . . . were absent . . . . Finally, on August 9, 2024, Plaintiff wrote his written response onto the disenrollment report form and we filed it. AR 1040.").  The Court notes that PO1 Tee's statement in the version of the disenrollment report at AR 1040 does not exactly match the statement included in the version of the disenrollment report at AR 12.  There are two differences.  First, the former is dated August 9, 2024, while the latter is dated September 6, 2024.  *Compare* AR 1040, *with* AR 12.  Second, the statements have different concluding paragraphs.  *Compare* AR 1040 ("Per the NSTC form 1533/120, I understand that I do not have any financial obligation and that I do not face recoupment action."), *with* AR 12 ("Additionally, if directed onto AES, I respectfully request waiver of financial reimbursement.").  During oral argument, the parties explained that PO1 Tee had to resubmit his student statement due to administrative changes made to the August 9, 2024 version.

[12] The Naval Manual requires PO1 Tee's command to complete the Disenrollment Checklist:

> When processing a[n] STA-21 [officer candidate] for disenrollment, the following shall be forwarded to NSTC [Officer Development]:
>
> (1) Disenrollment Checklist (NSTC 1533/159) and accompanying documents. A PRB is required for all STA-21 disenrollments, including the PNS endorsement with recommendation regarding continued active service and any student rebuttals . . . .

NSTC M-1533.2E § 6-17 ¶ 2(a).  Appendix P of the Naval Manual—titled "Performance Review Board (PRB) and Disenrollment Guidance"—further mandates that "the unit designated representative shall compile the disenrollment package using [the disenrollment checklist] as a guide."  *Id.* app. P § 3-3.

was "ordered to undergo a [Command Directed Mental Health Examination (CDE)] . . . 'due to the PRB.'"  AR 422.  Although PO1 Tee's counsel repeatedly challenged the grounds for the CDE, *see, e.g.*, AR 424 ("I believe the order [to undergo a CDE] to be retaliatory in nature and unlawful . . . ."), PO1 Tee "signed the CDE informed consent packet" and underwent medical examinations on February 14 and 20, 2024.  AR 22–23.  During a preliminary discussion between the clinical psychologist assigned to conduct the CDE and PO1 Tee's commanding officer—which was meant to "provide[] the circumstances around [the commanding officer's] request for a CDE" and "determine if a CDE was appropriate"—the commanding officer raised a list of questions to be addressed during the CDE:

> Is the member fit for continued military service in which he will earn a commission as an officer? Is the member suffering from a mental health disorder that would negatively impact or harm those around him or under his charge? The member is suspected of misconduct, does the member's mental health condition support an investigation into this matter?

AR 22–23.  While the CDE report concluded that "[a]t this time, PO1 Tee is likely not a suitable candidate for a Commissioned Officer," it also noted that he was "not endorsing symptoms consistent with a mental health condition" that would prevent his participation in PRB-2.  AR 24; *accord* AR 51.

Finally, the administrative record expands on the extent to which the Naval command considered PO1 Tee's medical status during the disenrollment process. Following PRB-2, on November 19, 2024, the CNSTC sent a letter to the PNS in which he approved PRB-2's disenrollment recommendation.  Therein, the CNSTC enclosed his November 14, 2024 decision letter and a disenrollment authorization form that PO1 Tee would eventually sign and return to the CNSTC.  Not among the documents provided to PO1 Tee, however, were other materials apparently reviewed by the CNSTC in determining whether to recommend PO1 Tee's disenrollment, including:

- An April 20, 2024 letter from the Navy Bureau of Medicine and Surgery (BUMED), which was listed as a "reference" in the CNSTC's decision letter, AR 3, that concluded PO1 Tee "d[id] not meet established physical standards due to suicidal ideation, anxiety and depression," AR 21;

- The PNS's two extra-record missives, discussed above, which included a summary of the CDE, confirmed the CDE report "was submitted to [BUMED] for consideration of [PO1 Tee's] continuance in the STA-21 program," and recommended that PO1 Tee be disenrolled from the STA-21 program, AR 12–15, 49–52; and

- An October 8, 2024 memorandum from the Director of Officer Development to the CNSTC that discussed the results of PRB-2 and noted that "[PO1] Tee [wa]s . . . medically disqualified by BUMED due to suicid[al] ideation, anxiety, and depression," AR 20.

PO1 Tee characterizes these documents as evidencing a "secretive disqualification process" through which the CNSTC improperly considered whether he was medically able to remain in the STA-21 program and under which his command denied him due process. ECF 51-1 at 12.

Notably missing from the administrative record, in contrast, are any additional documents attesting to what occurred during the nearly forty-minute pause in the PRB-2 proceedings. *See* AR 823 (board adjourning at 11:19 AM and coming to order at 11:58 AM). The Court raised this issue in its November 10, 2025 opinion. *Tee*, 179 Fed. Cl. at 44 ("Whether the recorder's proffered questions directed at PO1 Tee were duly sanctioned by the PRB-2's senior member, whether the questions were in fact clarifying questions reasonably tethered to PO1 Tee's counsel's opening statement, and whether the board members adopted an adverse inference from the fact that PO1 Tee refused to answer the recorder's questions, require a contextual review of the administrative record in this case. The fact that the alleged due process violations spanned non-transcribed exchanges between board members during a recess from the PRB-2 hearing underscores this conclusion.").

After the government filed the administrative record, PO1 Tee moved to complete and supplement it with additional documents and to further amend his complaint to add a count for unlawful consideration of extra-record evidence.[13] The Court granted PO1 Tee leave to file a third amended complaint but denied his motion to supplement the administrative record. Regarding the latter, the Court explained that PO1 Tee could renew his motion to supplement the administrative record in his follow-on motion for judgment on the administrative record, but only to the extent he could "explain how and why the NROTC command erred in not considering each document, include specific citations to the naval regulations that were consequently violated, and tie those alleged violations to the remaining allegations in his amended complaint." ECF 45 at 4. During oral argument, the Court granted-in-part and denied-in-part PO1 Tee's renewed motion to complete and supplement the administrative record, setting forth its reasons on the record, some of which are reiterated below. As directed, the government completed the administrative record on June 22, 2026.

---

[13] In the same filing, PO1 Tee moved for reconsideration of the Court's November 10, 2025 decision granting-in-part and denying-in-part the government's motion to dismiss, which the Court denied.

**DISCUSSION**

I.    Standard of Review

After initially moving for judgment on the administrative record, and as an alternative to his renewed motion to complete and supplement the administrative record, PO1 Tee requested that the Court review his proffered extra-record documents by recasting his dispositive motion "under summary judgment standards and *de novo* [review]." ECF 58 at 10. In support, PO1 Tee argues: "since [PO]1 Tee came to this Court in the first instance," rather than first seeking relief from the Board for Correction of Naval Records, "his dispositive motion is more appropriate for *de novo* review not confined to the [administrative record]." *Id.* at 8. The Court disagrees.

A servicemember's decision to bypass the Board for Correction of Naval Records (or any other branch's record correction board) and bring a complaint directly to this Court does not necessitate *de novo* review. *See, e.g.*, *Sieben v. United States*, 108 Fed. Cl. 1, 4–5 (2012) (recounting background, which did not include an appeal to a military record correction board, and noting that "[t]he Court is not called upon to reweigh the evidence, but instead to determine 'whether the *conclusion being reviewed* is supported by substantial evidence'" (emphasis in original) (quoting *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983))); *Finn v. United States*, 548 F.2d 340, 341–42 (Ct. Cl. 1977) ("[W]ithout having applied to the Board for the Correction of Naval Records, plaintiff filed this suit demanding that his 30 percent disability rating be changed to a 60 percent rating. . . . [A] determination by the Secretary that a plaintiff is entitled to a particular percentage disability or is fit for duty will not be overturned unless it was arbitrary or capricious or not supported by substantial evidence."). Instead, where the Court is tasked with reviewing an agency decision, its review is generally limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). As the United States Court of Appeals for the Federal Circuit has explained:

> [T]he Court of Federal Claims reviews [a military board]'s action under the same standard as any other agency action. Thus, the Court of Federal Claims should . . . appl[y] its ordinary standard of review to those disputes of fact occurring in the proceedings at the [military board]: "whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." This necessarily limits the Court of Federal Claims' review to the administrative record.

*Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) (citation omitted) (quoting *Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998)). Importantly, this does not strip the Court of "its ability to . . . consider 'extra-record' evidence in extremely limited situations." *Id.* But the proper vehicle to request that the Court do so is a

motion to supplement the administrative record, not a request to modify the standard of review.[14]

In adjudicating cross-motions for judgment on the administrative record under RCFC 52.1, the Court resolves factual disputes as it would at trial: by making factual findings in accordance with the weight of the evidence presented. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The Court reviews the decision-making body's proceedings "under a deferential standard of review, essentially the standard under which administrative agency decisions are reviewed: whether the [decision-making body's] decision is arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law." *Fisher v. United States*, 402 F.3d 1167, 1180 (Fed. Cir. 2005). The Court will "not substitute [its] judgment for that of the military 'when reasonable minds could reach differing conclusions on the same evidence.'" *Mote v. United States*, 110 F.4th 1345, 1354 (Fed. Cir. 2024) (per curiam) (quoting *Heisig*, 719 F.2d at 1156). Moreover, "the rule in military pay cases is that no relief is available for a procedural error that is 'harmless'—i.e., one that does not substantially affect the outcome of the matter." *Kaster v. United States*, 158 Fed. Cl. 86, 98 (2022) (first quoting *Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004); and then citing *Christian v. United States*, 337 F.3d 1338 (Fed. Cir. 2003)).

II.    Preliminary Inquiry Report

PO1 Tee asserts that he was not given a "complete" copy of the preliminary inquiry report in violation of governing military procedures. Addressing this issue, the Naval Manual requires:

> No later than five full business days (not counting the day of notification nor the day of the PRB) before the PRB is scheduled to convene, the recorder shall:

---

[14] None of the cases cited by PO1 Tee require a different conclusion. Two of those cases—*Lewis v. United States* and *Lippmann v. United States*—are inapposite because there, the parties were "not requesting that the court review an agency decision . . . ." *Lewis v. United States*, 114 Fed. Cl. 682, 685 (2014); *accord Lippmann v. United States*, 127 Fed. Cl. 238, 250 (2016) ("[T]he Court is not reviewing a prior decision of the Coast Guard or a military corrections board . . . ."). Here, the Court *is* tasked with reviewing an agency decision: namely, the Navy's decision to disenroll PO1 Tee from the STA-21 program. The third case relied on by PO1 Tee, *Tippins v. United States*, dealt with the availability of discovery, rather than the proper standard of review, in military pay cases. 149 Fed. Cl. 556, 561 (2020). Finally, in *Holt v. United States*, the Court was presented with "rather unique circumstances" where the challenged agency action was the refusal to even consider plaintiff's substantive claims. 64 Fed. Cl. 215, 219–20, *appeal dismissed*, 159 F. App'x 1004 (Fed. Cir. 2005). That is not the case here. To the extent any of the cited cases suggest otherwise, they are nonbinding, and the undersigned declines PO1 Tee's invitation to over-extrapolate from them. *See CGI Fed. Inc. v. United States*, 118 Fed. Cl. 337, 351 (2014), *rev'd on other grounds*, 779 F.3d 1346 (Fed. Cir. 2015); *Thermalon Indus., Ltd. v. United States*, 34 Fed. Cl. 411, 420 (1995).

. . .

> (2) Provide the student with any and all documents that may be presented in the case against the student, including but not limited to the PRB Convening Order, counseling sheets, witness statements, *and a complete copy of the preliminary inquiry* (if any) . . . .

NSTC M-1533.2E § 6-10 ¶ 6(a) (emphasis added).  As noted *supra*, PO1 Tee was given a redacted copy of the preliminary inquiry report on April 22, 2024—i.e., seven business days before PRB-2 was originally scheduled to convene and more than three weeks before it actually took place.  That version redacted the names, signatures, and contact information of certain individuals involved in and implicated by the recorder's preliminary inquiry.  Three days later, on April 25, 2024, Navy officials invited PO1 Tee to "to review all unredacted documents in-person" as early as April 26, 2024, AR 539, again, ahead of the five-day deadline set by the Naval Manual.  PO1 Tee was advised, however, that his review of the unredacted report must occur in person, under supervision, and without the possibility of taking notes or otherwise recording or capturing anything in the report.  He declined the Navy's invitation, rejecting restrictions that he and his counsel considered unacceptable.[15]  PO1 Tee ultimately received a physical copy of the unredacted report minutes before the PRB-2 hearing commenced to use during the proceeding.

PO1 Tee focuses on whether the redacted report originally sent to him was "complete."  But that is an oversimplification of the issue before the Court.  The dispositive issue is not whether the redacted version of the report given to PO1 Tee was "complete," but whether the Navy, through the redacted report or otherwise, timely "[p]rovide[d] [PO1 Tee] with . . . a complete copy of the preliminary inquiry [report]" within the meaning of the Naval Manual.  NSTC M-1533.2E § 6-10 ¶ 6(a).  The Navy did so by not just giving PO1 Tee a minimally redacted (albeit incomplete) version of the report but also inviting him to review the unredacted report ahead of the five-day deadline.

"When construing a regulation, the court applies the same interpretative rules it uses when analyzing the language of a statute."  *Mass. Mut. Life Ins. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015) (citing *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005)).  "Accordingly, it is appropriate to first consider the 'plain language [of the regulation] and consider the terms in accordance with their common meaning.'"  *Id.* (alteration in original) (quoting *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997)).  "In doing so, the court considers 'the text of the regulation as a whole, reconciling the section in

---

[15] *See* ECF 57 at 9 ("[PO1 Tee] didn't take the command up on their poor-man's offer to go sit and read the report while being barred from writing notes or taking copies.").

question with sections related to it.'"  *Id.* (quoting *Lengerich v. Dep't of Interior*, 454 F.3d 1367, 1370 (Fed. Cir. 2006)).

> When "interpreting a [regulation], the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole [regulation] (or [regulation]s on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the [agency]."

*Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194 (1856)).

As noted above, the Naval Manual requires the recorder to "[p]rovide the student with . . . a complete copy of the preliminary inquiry [report]" at least five full business days before the PRB is scheduled to convene.  NSTC M-1533.2E § 6-10 ¶ 6(a)(2).  The verb "to provide" generally means "to supply or make available (something wanted or needed) . . . [or] to make something available to . . . ." *Provide*, MERRIAM-WEBSTER, *available at* https://perma.cc/QL99-5A8F.  In determining the precise extent to which the Navy must make the preliminary inquiry report available to the student, the Court cannot read that requirement as if it exists in a vacuum. Instead, it must be read in the context of the whole Naval Manual, which contains provisions requiring the Navy to: on one hand, allow officer candidates to defend themselves during PRBs[16]; and, on the other, protect "personally identifiable information" entrusted to it.[17, 18]  Keeping those purposes in mind, the Navy can

---

[16] *See, e.g.*, NSTC M-1533.2E app. P § 2-4 ¶ 2(a)(1) ("Per NSTC [Judge Advocate General]—The purpose behind th[e] provision'" requiring the Navy to notify the student of the reasons for convening the PRB "is to give the student proper notice regarding why they're undergoing a PRB so that they may respond appropriately . . . .").

[17] The Naval Manual contains provisions that require the Navy to protect "personally identifiable information." *See, e.g.*, NSTC M-1533.2E § 5-22 ¶ 6 ("<u>Privacy Act Requirements</u>. The Privacy Act limits an agency's collection and sharing of personally identifiable information and imposes safekeeping, access, and other requirements." (underline in original)); *id.* § 5-10 (requiring PNS to adhere to "the limitations imposed by the Privacy Act" when disseminating "information promulgated by regulations, manuals, instructions, and notices" to "departmental staff personnel" and "students"); SECNAVINST 5211.5F § 5(a)(3) ("[Navy] personnel have an affirmative responsibility to protect an individual's privacy when maintaining Personally Identifiable Information . . . about an individual."). Navy regulations define "personally identifiable information" as "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual." SECNAVINST 5211.5F encl. 2 ¶ 12 ("Because there are many different types of information that can be used to distinguish or trace an individual's identity, the term [personally identifiable information] is necessarily broad."). It is axiomatic that names and contact information qualify under the Navy's broad definition of personally identifiable information, as that information can be used to "distinguish or trace [the] . . . identity" of the individuals included in the report.

[18] "SECNAVINST 5211.5F" is a citation to the May 20, 2019 letter from the Secretary of the Navy regarding the Navy's privacy program.  *See* SECNAVINST 5211.5F § 1(b) ("This issuance broadens

comply with its requirement to provide an officer candidate with a complete preliminary inquiry report while redacting personally identifiable information from the report in accordance with its Privacy Act responsibilities—as long as it makes that personally identifiable information reasonably available to the officer candidate through other means.  Here, the Navy did just that.

Three days after sending PO1 Tee and his counsel a minimally redacted version of the preliminary inquiry report, the command made the unredacted report—undisputedly "complete" under the Naval Manual—available to PO1 Tee for his in-person review.  Of note, PO1 Tee's command offered to schedule the in-person review weeks before PRB-2 convened, and the only material information redacted from the report were some twenty-six names of individuals mentioned in the report, only twelve of whom were either contacted by the Navy or gave statements or interviews to the Navy.  Given that the key redacted information was relatively limited and that the Navy offered to reveal that information to PO1 Tee, the Court finds that the Navy "provided"—i.e., made reasonably available—the complete preliminary inquiry report to PO1 Tee.

PO1 Tee charges that the above-stated conclusion is incorrect because the in-person review proposed by his command, particularly the restrictions imposed, frustrated his ability to adequately prepare for the PRB-2 hearing.  The Court disagrees.  As explained above, his interests were not the only ones at stake.  The Navy was faced with—and forced to strike a balance between—dually applicable and arguably competing requirements: on the one hand, provide PO1 Tee with a full and fair opportunity to defend himself against allegations of substandard conduct; on the other, prevent the improper disclosure of personally identifiable information contained in the unredacted report.  Given that the Naval Manual failed to prescribe or otherwise regulate the medium through which the "complete copy" should be "provide[d] [to] the student," the Navy's solution was reasonably designed to strike the right balance by giving PO1 Tee notice of the allegations against him without authorizing the unbounded disclosure of the personally identifiable information of victims and witnesses included in the unredacted report.  To be sure, the Navy conceivably could have crafted alternative procedures that might also have adequately balanced those competing requirements, possibly including—as PO1 Tee

---

the scope of the Privacy Act . . . guidelines to include policy and procedures contained [here]in . . . and other associated privacy laws."), *available at* https://perma.cc/VW3N-YGS9.  The Naval Manual cites to SECNAVINST 5211.5F as one of the two "guiding directive[s]" that speak to the Navy's Privacy Act requirements with which the PNS and its unit must comply.  NSTC M-1533.2E § 5-22 ¶ 6.  The other is the July 23, 2018 letter from the CNSTC regarding the Naval Service Training Command's (NSTC) privacy program (hereinafter, NSTCINST 5211.1B).  *See* NSTCINST 5211.1B § 1 ("The purpose of this instruction is to implement Privacy Act . . . actions and policies required by references [contained herein] for the commands, activities, and personnel of the [NSTC]."), *available at* https://perma.cc/HG79-9VVR.

suggested—the use of a protective order.[19]  But keeping in mind the text of the Naval Manual and its stated goals, the process the Navy followed was not erroneous. PO1 Tee's choices to repeatedly object to the Navy's procedures, characterize the Navy's offer to review the unredacted report in person as "meaningless," AR 532, and continue requesting a physical copy of the unredacted report do not alter that conclusion.

At bottom, PO1 Tee charges that the Navy's redaction of the identities and contact information of the victims, witnesses, and other sources of information included in the version of the preliminary inquiry report furnished to PO1 Tee frustrated the preparation of his defense ahead of the PRB-2 hearing.  *See* ECF 51-1 at 31 ("Throughout the report, the names of all the[] [witnesses, alleged victims, and sources of information] are redacted. . . . The value of Plaintiff and his counsel getting those names pre-board was . . . of unique importance.").  Understandably so, as the Naval Manual implies the importance of receiving a list of witnesses "expected to be called in the Recorder's case . . . ."  *See* NSTC M-1533.2E § 6-10 ¶ 6(a)(3).  As a matter of practicality, moreover, the identities of the individuals reported as substantiating specific allegations lodged against PO1 Tee likely would assist him and his counsel in preparing to rebut those charges.  But the Navy had to balance PO1 Tee's interest in mounting a defense against its obligation to protect witnesses—including those identified as victims—from improper disclosure of their personally identifiable information.  *Cf. Mikhashov v. Dep't of Def.*, No. 22-3485, 2024 WL 4332601, at *16 (D.D.C. Sep. 26, 2024) (collecting cases where "courts . . . upheld the withholding of . . . witness statements pertaining to internal investigations . . . [because] such information implicates a 'privacy interest in the information being withheld'" (additional citations omitted) (quoting *Insider Inc. v. Gen. Servs. Admin.*, 92 F.4th 1131, 1135 (D.C. Cir. 2024))); *Horvath v. U.S. Secret Serv.*, 419 F. Supp. 3d 40, 48 (D.D.C. 2019) (upholding agency's redaction of information that "would reveal the identity of the [declarants and interviewees] who provided sworn statements or were interviewed as part of the investigation because" the information implicated "substantial privacy interests").  And to the extent PO1 Tee was prejudiced by not knowing the names of his accusers, responsibility for that lack of knowledge cannot lie exclusively with the Navy when PO1 Tee declined the opportunity to review the unredacted report.  Accordingly, PO1 Tee's charge that the Navy violated the requirement in NSTC M-1533.2E § 6-10 ¶ 6(a)(2) to timely "provide [PO1 Tee] with . . . a complete copy of the preliminary inquiry [report]" must be rejected.

---

[19] *See* AR 532 ("If the command has a concern, it can be addressed by issuing a simple 1-page protective order."); AR 1400 (PO1 Tee's proffered protective order referenced in AR 532); ECF 57 at 6–7 ("If the Privacy Act prevented Plaintiff from receiving the complete, unredacted report pre-PRB, then why does he get a copy now? Yes, it's under a protective order, but Plaintiff's counsel offered to sign a protective order . . . before PRB 2 in our pleas to get the unredacted report." (emphasis omitted)).  The Court does not decide whether the use of a protective order would have satisfied the Navy's obligations under NSTC M-1533.2E § 6-10 ¶ 6(a)(2).

III.    UCMJ Article 31

PO1 Tee next argues that, during the PRB-2 proceeding, the recorder violated his rights under Article 31 of the UCMJ.  The Court outlined the issues necessary to resolve this dispute in its November 10, 2025 decision denying the government's motion to dismiss:

> The principal charge focuses on the PRB-2 reporter's alleged persistence in asking PO1 Tee sixty-four pre-planned questions notwithstanding the accused's steadfast invocation of his right against self-incrimination under Article 31 of the UCMJ. PO1 Tee asserts that the proverbial fruit of the poisonous tree further infected the PRB-2 proceedings during an off-the-record discussion among the board members, leaving at least one observer with the impression that the "spectacle" was designed "to demonstrate that [PO1] Tee invoked his right to remain silent because he had something to hide and because he was guilty." ECF 15-5 at 1.
>
> Article 31 of the UCMJ, titled "Compulsory self-incrimination prohibited," provides, in relevant part:
>
>> (a) No person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him.
>>
>> . . . .
>>
>> (d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him *in a trial by court-martial*.
>
> 10 U.S.C. § 831 (emphasis added). In the course of a PRB hearing—as opposed to a court-martial—Section 831(a) of the UCMJ must be read in conjunction with Section 6-12 of the Naval Manual, and as emphasized in the above-quoted statute, Section 831(d) of the UCMJ is seemingly inapplicable.
>
> Section 6-12 of the Naval Manual explains: "The student, and/or the student's counsel, will be afforded the opportunity to make a statement on the student's behalf. At the senior member's discretion, any board member may ask the student or counsel to clarify any testimony or statements brought before the board." NSTC M-1533.2E § 6-12 ¶ 3. As reflected in a transcript submitted to the Court, at the commencement of the PRB-2 hearing, PO1 Tee's counsel made an opening statement on the student's behalf. ECF 27-1 at 7–8. Whether the recorder's proffered questions directed at PO1 Tee were duly

sanctioned by the PRB-2's senior member, whether the questions were in fact clarifying questions reasonably tethered to PO1 Tee's counsel's opening statement, and whether the board members adopted an adverse inference from the fact that PO1 Tee refused to answer the recorder's questions, require a contextual review of the administrative record in this case. The fact that the alleged due process violations spanned non-transcribed exchanges between board members during a recess from the PRB-2 hearing underscores this conclusion. *Compare* ECF 27-1 at 32 (PRB-2 hearing audio recording stopped for thirty-nine minutes), *with* ECF 15-5 (witness/observer recollection of events during the PRB-2 hearing recess).

*Tee*, 179 Fed. Cl. at 44 (footnote omitted); *cf.* NSTC M-1533.2E § 3-2 ¶ 2 (Outlining the "standards of professional conduct" expected of "all NROTC staff and all student staff personnel," Section 3-2 of the Naval Manual notes: "These prohibited actions are outlined in numerous Navy and Marine Corps instructions and the [UCMJ]. The intent of this section is not to re-publish each of these instructions but as a reminder of expected standards of conduct.").

Rather than address the questions posed by the Court, PO1 Tee continues to rely on the above-referenced opinions expressed by a PRB-2 observer, alleges three Article 31 violations purportedly committed by the recorder during the PRB-2 hearing,[20] and summarily concludes that the alleged violations were not harmless because "it is very apparent that the over one-hour long event affected the Senior Member . . . [and] infected the board members' opinions of [PO1 Tee] and his innocence . . . ."[21] ECF 51-1 at 49–50. But the administrative record does not show

---

[20] *See* ECF 51-1 at 48–49 ("1. Under Article 31(b), . . . [PO1 Tee] was required to be read his rights prior to questioning. That never occurred. . . . 2. The recorder . . . did not scrupulously honor [PO1 Tee]'s multiple unequivocal invocations. . . . 3. . . . The recorder's attempt to compel [PO1] Tee to make a statement tended to degrade him . . . .").

[21] PO1 Tee also suggests that the recorder violated a separate provision of the Naval Manual by persisting in his requests to question PO1 Tee after the senior member ruled that PO1 Tee did not have to answer his questions. *See* ECF 51-1 at 49 ("Here, the Senior Member ruled some 3-4 times that he was 'cool' with [PO1 Tee] and his counsel's request that [PO1 Tee] be allowed to read a statement but not submit to questioning. The recorder didn't shut his mouth and say aye aye, sir. He persisted."). The Naval Manual states that, during a PRB, "[t]he rulings of the senior member are final with respect to the proceedings but are subject to review by higher authority." NSTC M-1533.2E § 6-12 ¶ 4. The senior member's "final" ruling—as PO1 Tee acknowledges, ECF 51-1 at 49—was that PO1 Tee could read a final statement without submitting to questioning. AR 819 ("Counsel: So OC Tee does have a statement he's going to read on. He's gonna respectfully pass on questions. . . . But he does have a statement that he would like to read that he wrote . . . . [Senior Member]: . . . Okay, cool . . . ."). The recorder did not violate that ruling by requesting clarification on whether he could read his planned questions without forcing PO1 Tee to answer them. AR 821 ("[Recorder]: The command did . . . *and I know you're refraining from answering questions*, but the command did want to specifically ask questions, *and you can obviously deny that's you[r] right*, but I feel obligated to ask the questions at least. [Senior Member]: Yeah." (emphasis added)). For the same reason, the Court rejects PO1 Tee's invitation to conclude—based on the administrative record in this case—that the recorder

14

that any board member was tainted by the recorder's conduct, nor does it evidence that the questions were ever read aloud during PRB-2.[22]   Thus, even assuming Article 31 applied to the PRB-2 hearing,[23] and further assuming the recorder's request to read his questions into the record ran afoul of Article 31, that error would be harmless.

"[T]he presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties." *Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011) (quoting *Rizzo v. Shinseki*, 580 F.3d 1288, 1292 (Fed. Cir. 2009), *overruled on other grounds by Francway v. Wilkie*, 940 F.3d 1304 (Fed. Cir. 2019)).   The presumption applies to military officials.  *See White v. United States*, 179 Fed. Cl. 609, 618 (2026) ("Military administrators are presumed to act lawfully and in good faith like other public officers . . . ." (cleaned up) (collecting cases)); *Adams v. United States*, 177 Fed. Cl. 59, 65 (2025) ("It is [plaintiff's] burden" in a military pay case "to overcome the 'presumption of regularity that attaches to all administrative decisions,' as well as 'the strong, but rebuttable, presumption that administrators of the military discharge their duties correctly, lawfully, and in good faith.'" (cleaned up) (citations omitted)).

Here, in response to PO1 Tee's counsel's pointed inquiry, each board member affirmed that they would not adopt an adverse inference against PO1 Tee if he refused to answer the recorder's questions:

> Counsel: [PO1 Tee] has the right to not make any statement before a board, just like in a court martial . . . or any other proceeding in the military. Will anyone hold it against them or take any points off when you all deliberate? Once we're out of the room, if he doesn't testify?
>
> [Senior Member]: No.

---

violated the requirements to treat staff and students "with the common human dignity and respect that they deserve," NSTC M-1533.2E § 3-2 ¶ 1, and conduct PRBs with "formality and decorum," *id.* § 6-9 ¶ 2.  *See* ECF 57 at 10–11.

[22] *See generally* AR 771–836 (PRB-2 transcript does not reflect substance of recorder's planned 64 questions); *cf.* AR 825 ("[Recorder]: I just want to state for the record that the command does have a lot of questions, 64 in total, that have not been addressed up until this point in the review process, through questioning of witnesses or statements. So, for the record, OC Tee is declining to answer any of these questions that the command has.").  During oral argument, moreover, PO1 Tee's counsel confirmed that the recorder did not read any of the pre-planned questions to the board members during the off-the-record discussion.

[23] The government disputes whether Article 31 applies to "military administrative proceedings" like PRB-2.  *See* ECF 54 at 40 (citing *Scarselli v. United States*, No. 17-507, 2020 WL 1670705, at *9 (Fed. Cl. Apr. 3, 2020) (additional citation omitted) (first citing 10 U.S.C. § 831(d); then citing *Sasen v. Spencer*, 879 F.3d 354, 362–64 (1st Cir. 2018); and then citing *United States v. Singleton*, 600 F.2d 553, 555 (5th Cir. 1979))).  The Court need not resolve this issue because, as explained herein, any alleged violation of Article 31 was harmless.

[Second Board Member]: No.

[Third Board Member]: No.

Counsel: Do you all understand the importance of that right? It doesn't mean he's hiding anything, right? It just means I probably told him, hey, don't testify. . . .[24]

AR 773.  Then, following an unrecorded break in the proceedings to allow the PRB-2 officials to discuss whether to permit the recorder to ask PO1 Tee his prepared questions, the Senior Member engaged PO1 Tee in the following colloquy:

[Senior Member]: . . . We have an opportunity to ask questions[,] right? Of you based off of the statements that were made. The information that was provided [and] those types of things. *It is absolutely not required as was told about your rights at the beginning of the PRB*, and I'm absolutely not trying to pressure you to change your mind or do anything like that, just clarifying for the record. You know, having your counsel speak for you is great, I just want to make sure that at this point that we have an affirmative statement from you right. Acknowledging, yes, I have an opportunity to answer questions. No, I do not want to, [r]ight? . . . So in this case the recorder has an opportunity to ask you questions, they prepared questions that they wanted to ask of you, to try to clarify some of the information that was provided in the government's case, and then in your guys['] exhibits as well, *if you do not want to answer those questions, that's fine*. I just want to have it reflected that they did prepare questions and then you have an opportunity to submit yourself to answer questions, *if you don't want to, that's fine*, but just want to have you state one last time instead of your counsel, and I appreciate you, [counsel], taking care of your client, just to say it. No, I don't want to answer questions or yes, I do want to answer questions. Those types of things for us from the board members and then including the reporter as well.

[PO1 Tee]: Gentlemen, I understand that there are questions[;] on the advice of counsel, I prefer not to answer questions.

[Senior Member]: Understood, and like I said, totally understand that not talking around that, not trying to make you feel bad or anything like that, right. So just if the counsel or excuse me, if you're not going to

---

[24] Rather than elicit further confirmation to this follow up statement, PO1 Tee's counsel immediately asked the PRB-2 board members whether they "have any personal relationship or friendship with the convening authority . . . ." AR 773.  Each responded: "No."  *Id.*

answer questions, then the next step then would be just to get to document the fact that we had questions ready.

AR 824–25 (emphasis added).

In contrast, the only evidence proffered suggesting that the board members *were* affected by the recorder's insistence on questioning PO1 Tee is an observer's statement that "as [the recorder] pushed on[,] it became clear that the senior member [of the board] was affected by [the recorder]'s persistence." AR 74. This amounts to nothing more than speculation about a presiding official's state of mind, which neither rebuts the presumption of regularity nor outweighs the board members' contemporaneous affirmations that they would not hold PO1 Tee's refusal to answer questions against him. Accordingly, PO1 Tee's assertion that his Article 31 rights were violated during PRB-2 falls short.

IV.    "Medical" Disenrollment

PO1 Tee asserts that the CNSTC improperly considered medically disenrolling him from the STA-21 program without giving him the required notice or an opportunity to contest the medical basis of his disqualification. In support, PO1 Tee cites the following documentation included in the materials the CNSTC reviewed in recommending PO1 Tee's disenrollment: the PNS Summary Letter dated July 29, 2024; the NROTC Student Disenrollment Report dated September 9, 2024; the April 20, 2024 BUMED letter; the March 4, 2024 CDE report; the memorandum from the Director of Officer Development to the CNSTC dated October 8, 2024; and the CNSTC's November 14, 2024 disenrollment recommendation. Examined in isolation, these documents can be interpreted to suggest that PO1 Tee's superior officers considered medically disenrolling him.[25] But in context, it is clear that the singular basis contemplated for PO1 Tee's disenrollment was aptitude.

To be certain, when an officer candidate in the STA-21 program is subject to medical disqualification proceedings, the Naval Manual requires that they be given notice of and an opportunity to respond to the medical basis of their proposed disenrollment. *See, e.g.*, NSTC M-1533.2E app. P § 2-4 ¶ 2(a) ("The student SHALL be notified of all reasons/triggers for the convening of the PRB."); *id.* § 6-16 ¶ 7 (outlining procedures to be followed when an officer candidate is considered for

---

[25] *See, e.g.*, AR 49 (PNS Summary Letter noting, under paragraph addressing the type of disenrollment: "Also for consideration but not used in the decision for disenrollment, the [preliminary inquiry] or the PRB, is the BUMED [letter] . . . ."); AR 23 (CDE report concluding that "PO1 Tee is likely not an appropriate candidate for a Commissioned Officer at this time"); AR 21 (BUMED letter explaining: "Based on a review of the available medical information, the subject applicant DOES NOT meet established physical standards due to suicidal ideation, anxiety and depression."); AR 15 (PNS's remarks noting that "OC Tee should not be commissioned, a fact that is supported by an impartial PRB, a CDE, BUMED, and my own personal military judgment"); AR 3 (CNSTC disenrollment recommendation listing the BUMED letter as a reference).

17

medical disqualification and noting: "These actions will be conducted parallel to the disenrollment process."); Department of Defense Instruction (DoDI) 1215.08 § 3.2(f)(1) ("When a medical disqualification, determined by the appropriate medical authority, forms the basis for disenrollment action, . . . the cadet or midshipman subject to disenrollment due to medical disqualification will be provided reasonable notice and the opportunity to prepare a response to the proposed disenrollment.").[26] The question before the Court thus centers on the nature of PO1 Tee's disqualification proceedings: specifically, were they triggered by aptitude concerns, medical concerns, or both?  If he was, to any extent, subject to medical disqualification proceedings, then the Navy should have adhered to the above-cited procedures.  Otherwise, PO1 Tee's argument on this issue must be rejected.

The Court finds that the sole basis for PO1 Tee's disenrollment proceedings was aptitude.[27]  Notably, the PNS Summary Letter—the singular document the CNSTC relied on to support his ultimate disenrollment recommendation—lists "Aptitude" as the only "Type of Disenrollment."  AR 3, 49.  This strongly suggests that the sole basis for PO1 Tee's disenrollment proceedings was aptitude, not medical inability to perform.  Moreover, neither of the challenged extra-record missives proposed medically disenrolling PO1 Tee.  The mere fact that the PNS Summary Letter mentioned the BUMED letter and CDE report did not introduce medical inability as a basis for PO1 Tee's disenrollment proceedings.  Indeed, the PNS's mention of these documents was consistent with the Naval Manual's requirement that the PNS shall include—in designated paragraphs of his Summary Letter—any "[p]revious administrative actions" and any unresolved "pending medical issues . . . that may hamper or delay *a non-medical disenrollment*":

---

[26] DoDI 1215.08 is a citation to the March 7, 2018 "Senior Reserve Officers' Training Corps (ROTC) Programs" document, which "establishes policy, assigns responsibilities, and prescribes procedures for [Department of Defense] oversight of the Military Departments' Senior ROTC programs . . . ." *See* ECF 64-1.

[27] *See, e.g.*, AR 1 (NSTC Final Disenrollment Routing Sheet—Subject line provides: "FINAL DISENROLLMENT (APTITUDE)"); AR 26 (same for interim Disenrollment Routing Sheet); AR 359 (PRB-2 Convening Order noticing that "a [PRB] shall be convened to investigate and make recommendations on [PO1 Tee's] substandard aptitude performance revealed during the Fall 2023 semester" and then specifying "inappropriate behavior toward female Officer Candidates and female Midshipmen and inappropriate personal conduct"); AR 186 (PRB-2 transcript recording that the basis for the administrative proceeding was "substandard aptitude performance," further specifying "allegations of inappropriate behavior toward female Officer Candidates and female Midshipmen, and inappropriate personal conduct"); AR 11 (NROTC Student Disenrollment Report listing "Aptitude (Failure in conduct standards or bearing)" as the "Reason" for "PNS Disenrollment Recommendations"); AR 8 (Memorandum from the Director of Officer Development to CNSTC stating: "OC Tee is recommended for an Aptitude disenrollment."); *id.* (Despite noting "PNS stated that OC Tee is currently medically disqualified by BUMED," the Director of Officer Development expressed his "concur[rence] with the PNS's recommendation for disenrollment and that OC Tee be ordered back to Active Enlisted Service."); AR 16 (Appointment Termination Disenrollment Authorization form listing "APTITUDE" as the "REASON FOR DISENROLLMENT").

e. Paragraph 5. Previous administrative actions. List all administrative actions that were issued during [the OC's] tenure in chronological order from oldest to current, and all matching supporting documents SHALL be included in the disenrollment package submission. . . .

. . .

f. Paragraph 6. Medical Considerations. Only list medical information pertinent to the disenrollment. Ensure there are no pending medical issues unresolved that may hamper or delay a non-medical disenrollment.

NSTC M–1533.2E app. P § 3-1 ¶ 3(e)–(f) (emphasis added); *see generally id.* app. P § 3-1 ¶ 3 ("Commanding Officer (PNS) Summary Letter (Example 6-K)"). The BUMED letter and CDE report documented previous administrative actions that occurred during PO1 Tee's tenure, which themselves addressed unresolved medical conditions that could have prevented—but ultimately did not affect—PO1 Tee's non-medical disenrollment.[28]  A contrary reading of the Naval Manual would automatically trigger collateral medical disenrollment proceedings whenever a medical evaluation is referenced in a PRB Summary Letter, regardless of whether the medical evaluation warranted such proceedings.

This conclusion is unchanged by the PNS's specific remarks in the NROTC Disenrollment Report.  To be sure, the PNS's remarks discuss the BUMED letter and CDE report, and they conclude: "Based on the recommendation from the PRB *and the CDE*, placing OC Tee in a supervisory role will be against good order and discipline." AR 15 (emphasis added).  While these facts facially support PO1 Tee's case, context makes clear that medical inability was not a basis for PO1 Tee's disenrollment.  For instance, in addition to the context discussed above, the PNS's remarks note at the outset that "PO1/OC Tee is being disenrolled *for aptitude reasons*, based upon results of the [PRB] held 15 May 2024." AR 13 (emphasis added).

Moreover, the mention of the BUMED letter and CDE report in the PNS's remarks is not particularly persuasive because the Naval Manual *required* the PNS to address these issues, regardless of the basis for PO1 Tee's proposed disenrollment. Specifying the contents of Paragraph 9 (PNS Recommendation) of the PNS Summary Letter, the Naval Manual provides: "If any new information, accusations against the unit have been made at any time during the disenrollment process, or the student

---

[28] Although the Naval Manual instructs the PNS to "[o]nly list medical information pertinent to the disenrollment," as quoted above, the next sentence directs the PNS to "[e]nsure there are no pending medical issues unresolved that may hamper or delay *a non-medical disenrollment*."  NSTC M-1533.2E app. P § 3-1 ¶ 3(f) (emphasis added).  Here, the PNS was certifying to the CNSTC that PO1 Tee's medical history would not prevent the Navy from following through with his aptitude disenrollment. AR 51 ("[T]he CDE that was conducted concluded that OC Tee was fit to continue with his PRB process.").

has submitted a statement in response to the [NROTC Student Disenrollment Recommendation/Report[29]] or the CO's Recommendation/Decision Letter, *it must be addressed in this section.*"  NSTC M-1533.2E app. P § 3-1 ¶ 3(i) (emphasis added).[30] That is, the PNS was required to make note of PO1 Tee's documented medical concerns—but not necessarily rely on them as a basis for disenrollment proceedings— because PO1 Tee himself raised them.  *Compare* AR 12, 1040 ("[PO1 Tee] reiterate[s] the written matters [he] previously provided via [his] attorney, which [were] provided to the command on 03 July 2024."), *with* AR 63–64 (July 3, 2024 statement from PO1 Tee's attorney explaining that, after PRB-1, "OC Tee was distraught and uncontrollably crying[,] . . . put on suicide watch, and then driven to a military medical facility for treatment.").  PO1 Tee thus triggered the above-quoted Naval Manual requirement that the PNS address any new information, accusations against the unit, or assertions contained in a student statement submitted in response to the NROTC Student Disenrollment Report.[31]  In sum, the PNS's unequivocal statement that PO1 Tee was being considered for aptitude disenrollment, combined with the Naval Manual's requirement that the PNS address specific issues raised during the disenrollment process, undermines PO1 Tee's claim that his command improperly considered him for medical disenrollment.[32]

Nor does the CNSTC disenrollment recommendation substantiate PO1 Tee's claim that his reported mental health concerns served as a basis for his disenrollment from the STA-21 program.[33]  Although the BUMED letter and the CDE report found

---

[29] For clarity, before this alteration, the Naval Manual referenced "NSTC 1533/122."  The Naval Manual seemingly uses NSTC 1533/122 to refer to both the NROTC Student Disenrollment Recommendation and the NROTC Student Disenrollment Report.  *Compare* NSTC M-1533.2E § 4-36 ¶ 1(h) ("NROTC Student Disenrollment Recommendation (NSTC 1533/122)"), *and id.* app. P § 3-1 ¶ 1 ("NSTC 1533/122 (04-17) - NROTC Student Disenrollment Recommendation)"), *with id.* app. L(13) ("NSTC 1533-122 . . . – NROTC Student Disenrollment Report").

[30] While this requirement explicitly applies to the PNS Summary Letter rather than the NROTC Student Disenrollment Report, the Naval Manual provides: "The PNS remarks [from the NROTC Student Disenrollment Report] can be copy/pasted word-for-word to the PNS Summary Letter." NSTC M-1533.2E app. P § 3-1 ¶ 1(h).

[31] The same holds true regarding PO1 Tee's allegations that his command engaged in witness tampering in advance of the PRB-2 hearing.  *Compare* AR 12, 1040 (quoted above), *with* AR 71–72 (statement from PO1 Tee's attorney alleging that "the command . . . actively tampered with witnesses in an attempt to affect testimony . . . .").

[32] These conclusions apply equally to the Director of Officer Development's letter to the CNSTC, which calls attention to the fact that "[t]he PNS stated that OC Tee is currently medically disqualified by BUMED due to suicid[al] ideation, anxiety, and depression," and then reiterates that "[t]here are no other known academic, aptitude, disciplinary, medical or personal factors impacting this disenrollment." AR 20.  The letter was merely summarizing the PNS's statements which, as addressed *supra*, appropriately mentioned the BUMED letter in accordance with NSTC M-1533.2E app. P § 3-1 ¶ 3.

[33] PO1 Tee further submits that the CDE's proceedings and findings were flawed.  In support, he proffers an expert report by a clinical and forensic psychologist who reportedly examined PO1 Tee "while applying DoD regulations and commonly accepted military medical practices." ECF 51-1 at 44.

that PO1 Tee "DOES NOT meet established physical standards . . . for continuation in a program leading to commissioning . . . ," AR 21; *accord* AR 24 ("At this time, PO1 Tee is likely not a suitable candidate for a Commissioned Officer."), those documents were not referenced in the preliminary inquiry report, mentioned in the PRB-2 transcript, or relied on by the CNSTC in recommending that PO1 Tee be disenrolled from the STA-21 program. The CNSTC cited one document to support his disenrollment recommendation: the PNS Summary Letter, which, as noted *supra*, explicitly recommended PO1 Tee for "Aptitude" disenrollment. *See* AR 3 ("Per reference (a) [i.e., the July 29, 2024 PNS Summary Letter], [OC] Tee is recommended for disenrollment from the STA-21 Program."); AR 49–52 ("Type of Disenrollment: Aptitude.").

Notwithstanding the foregoing, PO1 Tee maintains that, by including the BUMED letter as a listed reference in his disenrollment recommendation, the CNSTC indicated that he had, in substance, based his decision at least in part on the findings in the BUMED letter. But the Navy Correspondence Manual PO1 Tee cites for that proposition—which directs servicemembers to "[u]se only those references that bear directly on the subject at hand," SECNAV M-5216.5 § 7.2 ¶ 10(a)[34]—does not compel that conclusion. Even if the BUMED letter "bear[s] directly on" issues before the CNSTC, that does not mean that the contents of the BUMED letter contributed to the disenrollment decision itself. The more logical explanation is that the BUMED letter was considered by the CNSTC simply because, as discussed *supra*,

---

During oral argument, the Court denied PO1 Tee's request to supplement the administrative record with this report, explaining: his challenges to the CDE proceedings and findings were not material to the disenrollment proceedings at issue; legal arguments included in an expert report should not be credited by the Court; and competing medical opinions regarding PO1 Tee's mental health present quintessential nonjusticiable issues. *Cf. Silver State Solar Power S., LLC v. United States*, No. 18-266, 2020 WL 6139865, at *4 (Fed. Cl. Oct. 19, 2020) ("[N]o witness, whether a fact or expert witness, is permitted to offer his or her own legal interpretation because it usurps the province of the Court to determine the law. Matters of law are ultimately reserved for the Court. As such, any statement purporting to explain, analyze, or decide legal concepts, which are matters for the Court to decide, must be excluded." (first citing *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997); and then citing *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 6 (2007))); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1383 (Fed. Cir. 2009) ("[E]ven if we were to give some weight to these declarations" that should not have been used to supplement the record, "they do not end the inquiry. After all, a decision is not necessarily unreasonable simply because the disappointed bidder is able to find two witnesses who disagree with it."); *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 672 (2009) ("Plaintiff apparently believes that it has an unfettered right to submit declarations giving its commentary on every aspect of the [dispute before the Court], and to have those declarations included in the administrative record. This is not the law." (citations omitted)); *Heisig*, 719 F.2d at 1153 ("It is . . . settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." (footnotes omitted) (collecting cases)).

[34] SECNAV M-5216.5 is a citation to the June 2015 version of the Department of the Navy's Correspondence Manual. *See Correspondence Manual*, DEP'T OF THE NAVY (June 2015), *available at* https://perma.cc/8FX8-SC3A.

the Naval Manual required the PNS to reference the BUMED letter in his Summary Letter. NSTC M-1533.2E app. P § 3-1 ¶ 3(e)–(f). As noted above, the CNSTC explicitly stated that the sole document supporting PO1 Tee's disenrollment was the PNS Summary Letter, which itself stated that the sole basis of PO1 Tee's disenrollment was aptitude. On this record, the Court declines PO1 Tee's invitation to conclude that, while "[t]he stated basis was solely aptitude, . . . in reality the final decision maker actually made his decision based on aptitude [plus] medical disqualification."[35] ECF 57 at 13 (emphasis omitted); *see Sickels*, 643 F.3d at 1366.

Finally, PO1 Tee argues that the inclusion of the two extra-record missives in his disenrollment recommendation was improper because he was not afforded an opportunity to respond to either of them. In support, he cites *Rogers v. United States*, 124 Fed. Cl. 757 (2016), and "the broad intent of the regulatory framework." ECF 51-1 at 44–45; *accord* ECF 48 at 43–44 (Count XI). Contrary to PO1 Tee's assertions, however, the Naval Manual does not entitle him to "notice of everything that will be considered by the . . . CNSTC" or "a chance to be heard on all of it," ECF 51-1 at 45, and *Rogers* is inapposite.

The Naval Manual outlines procedures that must be applied to the completion of the disenrollment report:

> The PNS shall personally sign all disenrollment reports and make the appropriate recommendations. . . . The student is also required to sign the disenrollment report. In doing so, the student may address any matters pertaining to the disenrollment recommendation. In effect, the student is allowed to make two statements: one immediately following the PRB, and a second prior to completion of the disenrollment report. There is no separate appeal process of a disenrollment recommendation as every disenrollment package, including student statements, is reviewed by each signature authority as the disenrollment package progresses . . . .

NSTC M-1533.2E § 6-14 ¶ 4. PO1 Tee took the opportunity to make both statements contemplated by the above-quoted provision of the Naval Manual. Immediately following PRB-2, PO1 Tee, through counsel, submitted a statement objecting to

---

[35] PO1 Tee's reliance on U.S. Navy Regulation ch. 11 § 3 art. 1123 ¶ 3 (1990) is similarly misplaced. This regulation affords sailors the right to access their medical record and add a rebuttal statement after an adverse entry is made. The Court need not address whether the CDE or BUMED letter triggered this regulation and, if they did, whether any consequences would have arisen. As an initial matter, nothing in the record presented confirms that either document was added to PO1 Tee's medical record. Additionally, as discussed *supra*, PO1 Tee's mental health diagnosis was not a material factor in his disenrollment. *See Christian*, 337 F.3d at 1343 ("To recover back pay, it is not enough for the plaintiff to show merely that an error or injustice was committed in the administrative process; he must go further and . . . make a showing that the defect substantially affected the decision to separate him or relieve him from active duty . . . ." (citation omitted)).

PRB-2's findings. Then, prior to the disenrollment report's completion, PO1 Tee inserted his student statement—again, objecting to PRB-2's findings—into the disenrollment report.

PO1 Tee seemingly takes issue with the fact that he was required to enter his statement into the disenrollment report *before* the PNS entered his remarks into the same document, explaining: "After a PRB, the PNS's disenrollment recommendation is appended to the disenrollment report, which is *then* forwarded to the student for rebuttal, before transmission to CNSTC for adjudication." ECF 51-1 at 44 (emphasis added) (citing NSTC M-1533.2E § 6-14 ¶ 4). But the provision of the Naval Manual PO1 Tee cites (quoted above) does not require the PNS to complete the PNS Remarks section—which is notably placed below the Student Statement section— prior to the student signing the NROTC Student Disenrollment Report. In fact, the Naval Manual suggests otherwise: it provides that the student's signature and any statement are affixed "*prior to* completion of the disenrollment report," and that "[t]here is no separate appeal process of a disenrollment recommendation." NSTC M-1533.2E § 6-14 ¶ 4 (emphasis added). This interpretation further allows for the PNS to comply with NSTC M-1533.2E app. P § 3-1 ¶ 3(i), addressed *supra*, by addressing new information, accusations against the unit, and a student statement submitted in response to the NROTC Student Disenrollment Report.

The Navy also complied with "the broad intent of the regulatory framework." PO1 Tee was given every opportunity to submit statements prescribed by the Naval Manual. *Compare, e.g.*, NSTC M-1533.2E § 6-13 ¶ 4 ("The student shall be given a copy of the PNS's endorsement, and the student will be given up to five full business days to respond to the recommendations in the PNS's endorsement."), *with* AR 61–73 ("Subj[ect]: Response to Commanding Officer's Endorsement to Performance Review Board #2—In the Case of OC (PO1) Ignatius Tee, USN"); AR 12 (Student Statement included in NROTC Student Disenrollment Report); AR 254–57 (Response to PRB-2 Report). Moreover, as addressed *supra*, the creation and content of the challenged extra-record missives are contemplated by specific provisions of the Naval Manual. *See* NSTC M-1533.2E § 6-14 ¶ 4 ("The PNS shall personally sign all disenrollment reports and make the appropriate recommendations."); *id.* app. P § 3-1 ¶ 3(i) ("[T]his is the PNS's final opportunity to provide their final thoughts on the disenrollment to NSTC."). In addressing PO1 Tee's mental health and allegations that his command engaged in witness tampering, the PNS complied with applicable Naval Manual requirements to: record all prior administrative actions; explain any unresolved medical issues that might impact the non-medical disenrollment; and address new information, accusations against the unit, and any student statement submitted in response to the NROTC Student Disenrollment Report.

A comparison to the regulatory violation found in *Rogers* highlights the Navy's compliance with the Naval Manual in this case. In *Rogers,* the command—in his endorsement of the disciplinary board's findings—introduced, for the first time in those proceedings, "references to derogatory statements about [plaintiff]'s character

23

and leadership." *Rogers*, 124 Fed. Cl. at 772.  He was, however, under no obligation to do so.  *Id.* (finding the command's "endorsement included not only" information the command was required to mention under applicable regulations, "but also references to derogatory statements" not contemplated by the same regulations).  Here, by contrast, the challenged statements included in the two extra-record missives dealt with matters that the PNS was affirmatively required to address under the Naval Manual.  Accordingly, the CNSTC did not err in considering the PNS's remarks included in the NROTC Disenrollment Report or the narrative included in the PNS Summary Letter.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record (ECF 51-1), as amended (ECF 58 at 7–10), is **DENIED**, and defendant's cross-motion for judgment on the administrative record (ECF 54) is **GRANTED**.  The Clerk of Court is directed to enter judgment accordingly.  No costs.

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge

24